# STATE OF NORTH CAROLINA

_____ Buncombe _____ County

File No. 21CV21074

In The General Court Of Justice
☐ District ☒ Superior Court Division

| Name Of Plaintiff | |
| --- | --- |
| Sunshine Chevrolet | |
| **Address** | |
| 11 N. Market Street | |
| **City, State, Zip** | |
| Asheville, NC 28801 | |

**CIVIL SUMMONS**
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

**VERSUS**

| Name Of Defendant(s) | Date Original Summons Issued |
| --- | --- |
| New York Marine and General Insurance Company, Prosight Specialty Insurance Group, Inc. and Prosight Global, Inc. | |
| | Date(s) Subsequent Summons(es) Issued |

**To Each Of The Defendant(s) Named Below:**

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
| --- | --- |
| Prosight Specialty Group, Inc. | Prosight Global, Inc. |
| 412 Mount Kemble Ave., Suite 300 C | 412 Mount Kemble Ave., Suite 300 C |
| Morristown, NJ 07960 | Morristown, NJ 07960 |

⚠ **IMPORTANT! You have been sued!** These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra!** Estos papeles son documentos legales. ¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time |
| --- | --- | --- |
| Stephen J. Grabenstein | 3-17-2021 | 3:15 ☐ AM ☒ PM |
| Van Winkle Law Firm | **Signature** | |
| PO Box 7376 | _[signature]_ | |
| Asheville, NC 28801 | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time |
| --- | --- | --- |
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | **Signature** | ☐ AM ☐ PM |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

FILED

2021 MAR 17 P 3: 15

BUNCOMBE COUNTY, C.S.C.

BY _____

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 01074

SUNSHINE CHEVROLET, LLC,

Plaintiff,

v.

NEW YORK MARINE AND GENERAL
INSURANCE COMPANY, PROSIGHT
SPECIALITY INSURANCE GROUP, INC,
and PROSIGHT GLOBAL, INC.,

Defendant.

**COMPLAINT FOR BREACH
OF CONTRACT, UNFAIR AND
DECEPTIVE TRADE PRACTICES**

COMES NOW the Plaintiff, by and through the undersigned, and complaining of the actions of the Defendants, state as follows:

## NATURE OF THE ACTION

1.      This is an action by Sunshine Chevrolet, LLC to recover insurance proceeds due under the Crime and Fidelity Coverage provided to the Plaintiff under New York Marine and General Insurance Company ("Marine") Policy CR2019DOP00439 (the "Policy").

## PARTIES

2.      Plaintiff is a Limited Liability Company authorized to transact business in the State of North Carolina.   Plaintiff operates Sunshine Chevrolet in Buncombe County, North Carolina.

3.      Defendant Marine is an insurance company which provides insurance coverage to business entities across the United States, including businesses in the State of North Carolina.

4.      Defendants ProSight Specialty Insurance Group, Inc ("ProSight") and ProSight Global, Inc. are Delaware corporations which own and provide a variety of services for Marine.

## FACTUAL BACKGROUND

5.     The Plaintiff operates an automobile dealership in Buncombe County and carries a variety of insurance policies on its operations. The Policy at issue in this matter provides the Plaintiff with crime and fidelity coverage.

6.     Marine issued the Policy to the Plaintiff effective August 1, 2019.

7.     Paul Hellwege ("the employee") was employed by the Plaintiff in 2019 as a Sales Manager. In early 2019, the employee began putting incentives and rebates into deals on vehicles he sold knowing that the vehicles did not qualify for such incentives or rebates.

8.     The Plaintiff was not aware that the employee was including incentives and rebates on his sales when the vehicle being sold did not qualify for the claimed incentives and rebates.

9.     As a result of the employee's actions, the Plaintiff was losing significant money on every vehicle sold by the employee that included the incentives and rebates which the vehicle did not qualify for.

10.     The Plaintiff became aware of a problem in September of 2019 when its Factory Receivables account was rapidly increasing. This is the account the Plaintiff uses to track and monitor factory rebates and dealer incentives on vehicles. The Plaintiff discussed the situation with the employee at that time. He continued to misrepresent his actions and claimed that he would follow up on getting the rebates and incentives paid.

11.     For a number of reasons, the Plaintiff terminated the employee in January of 2020. It was after the employee's termination that that the Plaintiff discovered the truth about what the employee had been doing with the fraudulent incentives and rebates.

12.     Following the employee's termination, the Plaintiff reviewed all of the sales

which the employee had been involved in during the prior year.

13.     It was through this review of the employee's 2019 sales that the Plaintiff discovered that the employee was putting incentives and rebates into car deals that could never be claimed from the manufacture because the vehicles did not qualify for the incentives and rebates that the employee claimed.  The Plaintiff's early 2000 review of the employee's 2019 sales also showed that the Plaintiff has lost $203,123.00 in sales revenue as a result of the fraudulent incentives and rebates used by the employee.

14.     The Policy with Marine, which is attached as Exhibit A to this Complaint and incorporated herein by reference, provides coverage for employee theft.  The section providing such coverage states that Marine will pay for loss or damage to money, securities and other property resulting directly from theft committed by an employee.

15.     Money is defined in the Policy, logically enough, as currency, coins and bank notes.  Other property is defined in the Policy as any tangible property other than money and securities which has intrinsic value.

16.     Theft is defined in the Policy as the unlawful taking of property to the deprivation of the insured.

17.     The employee was Plaintiff's employee at the time of his fraudulent actions.  By falsely claiming incentives and rebates on vehicles which did not qualify for the claimed incentives and rebates, the employee reduced the sales price of each such vehicle.  This meant the Plaintiff lost money on the sales of all such vehicles.  It also meant that some of the Plaintiff's property, its inventory of vehicles sold by the employee with fraudulent incentives and/or rebates, was harmed by being sold at below market value.

18.     As these factors established a claim under the Policy, the Plaintiff submitted a

claim on this loss to the Defendants in late February of 2020. The Plaintiff followed up its claims submission by providing the Defendants in March of 2020 with a large number of documents which outlined what the employee had done and how the Plaintiff lost money as a result of his actions.

19. Several months went by with little to no action on the part of the Defendants. In June of 2020, the Plaintiff's adjuster on this loss indicated that Marine was trying to determine how best to measure this loss.

20. The Plaintiff heard little from Marine in July of 2020 but continued working with its adjuster in providing Marine with specific information about the full extent of the loss Plaintiff sustained as a result of the employee's actions.

21. By late July and early August of 2020, the Plaintiff had to resort to inquiries to its adjuster and its contact at ProSight about what was going on with review of its claim.

22. On August 20, 2020, the Plaintiff was advised by its insurance agent, who was also trying to help shepherd Plaintiff's claim through Defendant's review system, that the Defendants were wondering if the claim was an indirect loss under the Policy and therefore not covered.

23. The Plaintiff reached out to its contact at ProSight on August 20th and explained in some detail why its claim was very much a direct economic loss and not an indirect loss. The Plaintiff specifically advised ProSight at this time that this was not a situation where the Plaintiff simply failed to receive hoped for incentives and rebates from the manufacturer of the vehicles. The Plaintiff pointed out to ProSight that the vehicles involved in the fraudulent scheme did not qualify for the claimed rebates and incentives. The Plaintiff made plain to ProSight at this time that it had sustained a direct loss of money on each sale where the employee used fraudulent

incentives and rebates. As it had been six months since the Plaintiff submitted its claim, the Plaintiff also asked, on August 20, 2020 for the Defendants to resolve its claim.

24. Hearing nothing in response to its August 20th inquiry, the Plaintiff contacted ProSight again on August 25, 2020 asking for a reply to its August 20th missive and requesting a phone call with its contact at ProSight.

25. ProSight's representative did respond to the Plaintiff on August 25th, but only to report that Defendants were still reviewing the claim.

26. On August 30, 2020, the adjuster on the claim advised the Plaintiff that the Defendants wanted additional information from the Plaintiff. This request was made even though the Plaintiff had, months earlier, provided the Defendants with all relevant information regarding the loss.

27. The Defendants continued to do nothing on the Plaintiff's claim in September of 2020. By late September, the Plaintiff again was asking for updates and information about the handling of its claim.

28. By early October of 2020, the Plaintiff had had enough of the Defendants' stalling and delays in the handling of its claim and demanded that Defendants act on the claim.

29. ProSight responded to Plaintiff's demand on October 15th. In a letter written to Plaintiff on that date, ProSight began to shift the focus of the Plaintiff's claim away from the money which the Plaintiff lost from the employee's actions to the amount of commissions which had been paid to the employee as a result of his use of fraudulent incentives and rebates. By focusing on the commissions issue rather than the loss of money to the Plaintiff from the employee's actions, ProSight was essentially reducing the value of Plaintiff's claim by nearly two hundred thousand dollars.

30. ProSight's October 15th letter to the Plaintiff incredulously stated that it appeared to ProSight that the employee in question did not take anything of value from the Plaintiff. This statement was made despite the Plaintiff's message to ProSight in August which detailed its direct loss and despite the Plaintiff having provided ProSight with ample records illustrating the money which the Plaintiff lost as a direct result of the employee's actions.

31. On November 16, 2020, ProSight's agent wrote Plaintiff advising that the Defendants were denying coverage for the bulk of Plaintiff's loss. The Defendants denied the more than two hundred-thousand-dollar claim as they determined that the amount that the Plaintiff hoped to receive as rebates from the manufacturer was excluded under the Policy as an indirect loss. The Defendants based their denial of coverage on this basis despite being told by the Plaintiff months earlier that it did not hope to receive any rebates on the employee's fraudulent sales as the vehicles involved did not qualify for such rebates.

32. The Defendant's denial of the Plaintiff's claim on November 16th focused inordinate attention on the Plaintiff's inability to obtain rebates from the manufacturer even though the Plaintiff had explained manufacturer rebates were not even possible on the vehicles sold by the employee.

33. The Defendant's denial of the Plaintiff's claim did not address or acknowledge the significant loss of money that the Plaintiff sustained as a result of the employee selling Plaintiff's vehicles for less than their value.

34. The Defendant's denial of the Plaintiff's claim did not address or acknowledge the significant loss of value in the Plaintiff's inventory of vehicles that resulted from the employee's actions.

## COUNT ONE – BREACH OF CONTRACT

35.	The Plaintiff reasserts and incorporates by reference the provisions of paragraphs 1 through 34 of this Complaint.

36.	The Plaintiff provided ample evidence to the Defendants that the employee had unlawfully taken its property to the deprivation of the Plaintiff.

37.	The Plaintiff provided ample evidence to the Defendants that when the employee unlawfully diminished the sales prices of Plaintiff's vehicles, he took money from the Plaintiff.

38.	The Plaintiffs provided ample evidence to the Defendants that when the employee unlawfully decreased the value of vehicles he sold, he damaged the value of the Plaintiff's property.

39.	Given these facts, the Policy contractually commits the Defendants to make a timely payment of benefits to the Plaintiff.

40.	The Defendants have failed to pay the Plaintiff what is owed to the Plaintiff under the Policy. The Defendants' failure to perform their obligations under the Policy has caused the Plaintiff substantial damages.

41.	As a result of Defendants' breach, the Plaintiff is entitled to recover from the Defendants damages in excess of $25,000.00.

## COUNT TWO – UNFAIR AND DECEPTIVE TRADE PRACTICES

42.	The Plaintiff reasserts and incorporates by reference the provisions of paragraphs 1 through 41 of this Complaint.

43.	At all times relevant to this Complaint, Defendants were engaged in commerce in the State of North Carolina.

44.	The Defendants failed to acknowledge and act reasonably promptly on communications under the Policy.

45.     The Defendants failed to adopt and follow reasonable standards for the prompt investigation of the Plaintiff's claim, did not attempt in good faith to effectuate a prompt, fair and equitable settlement of the Plaintiff's claim, delayed its investigation into the Plaintiff's claim, and delayed payment of this claim.

46.     The Defendants have refused to pay the Plaintiff's claim without conducting a reasonable investigation into all available information regarding the claim.

47.     The Defendants have compelled the Plaintiff to institute litigation to recover amounts due under the Policy by offering the Plaintiff substantially less than the amount due.

48.     These actions and others by the Defendants constitute unfair and deceptive trade practices under N.C.G.S. §75-1.1.

49.     The Plaintiff has been harmed by Defendants' unfair and deceptive trade practices.

50.     The Plaintiff is entitled to have its damages for Defendants' unfair and deceptive trade practices trebled and is entitled to having Defendants pay its attorney's fees in this matter as a result of Defendants' unfair and deceptive trade practices.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(a)     That Defendants be found to have breached the contract of insurance issued to the Plaintiff and be ordered to pay to the Plaintiff benefits under said policy in excess of $25,000.00;

(b)     That the Court declare Defendants' actions to be unfair and deceptive in violation of the provisions of N.C.G.S. § 75-1.1;

(c)     That Plaintiff's damages for Defendants' unfair and deceptive trade practices be trebled;

(d)     That the Plaintiff recover its attorneys' fees in this matter from the Defendants as a result of Defendants' unfair and deceptive trade practices;

(e)     That the Plaintiff have a trial by jury of this matter; and

(f)     That Plaintiff have such other and further relief as the Court deems just and proper.

This the ___17th___ day of March, 2021.

VAN WINKLE, BUCK, WALL, STARNES & DAVIS, P.A.

By: _____

Stephen J. Grabenstein (State Bar #: 18848)
Attorneys for Plaintiff
11 North Market Street
P.O. Box 7376
Asheville, North Carolina 28802
(828) 258-2991 (phone)
(828) 257-2773 (fax)





# REPORT A CLAIM

## QUICK. CONVENIENT. FOCUSED.

TELL US WHAT HAPPENED AND WE'LL IMMEDIATELY BEGIN TO DELIVER THE AWESOME SERVICE THAT IS THE HALLMARK OF PROSIGHT.

**We'll focus first on assuring your well-being. Then, we'll tend to every detail of your claim with care.**

 **EMAIL**    claims@prosightspecialty.com

 **FAX**    1-855-657-3534

 **MAIL**    ProSight Specialty Insurance Claims Department
412 Mt. Kemble Avenue Suite 300C
Morristown, NJ 07960

 **PHONE**    1-800-774-2755
Press '1' to Report a Claim / Anytime - days, nights & weekends
*For inquiries on previously reported claims:*
Press '2' Workers' Compensation Claims
Press '3' All Other Claims

 **ONLINE**    customer.prosightspecialty.com

PN 04 99 37   11/17    As used herein, "ProSight" refers to the insurers of ProSight Specialty Insurance Group underwriting insurance policies or bonds, which include New York Marine and General Insurance Company, Gotham Insurance Company and Southwest Marine and General Insurance Company. Actual coverage is specified by the policies or bonds issued. ProSight Specialty, 412 Mt Kemble Ave, Morristown, NJ 07960.

SIGNATURE PAGE

In witness whereof, New York Marine and General Insurance Company has caused this policy to be signed by its president and secretary.

_(signature)_

Joseph J. Beneducci
President

_(signature)_

Frank D. Papalia
Secretary

Named Insured: Don Elliott Chevrolet, Inc DBA Don Elliott Autoworld

Policy #: CR2019DOP00439

Policy Period: 8/1/2019 - 8/1/2020

IL 0001 (1010)

# CRIME AND FIDELITY COVERAGE
# PART DECLARATIONS
# (COMMERCIAL ENTITIES)

The Crime And Fidelity Coverage Part (Commercial Entities) consists of this Declarations form and the Commercial Crime Coverage Form.

**Coverage Is Written:**

[X] Primary ☐ Excess ☐ Coindemnity ☐ Concurrent

---

**Employee Benefit Plan(s) Included As Insureds: Don Elliott Auto Group 401K Plan**

---

| | Insuring Agreements | Limit Of Insurance Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|---|
| 1. | **Employee Theft** | $ 150,000 | $ 2,500 |
| 2. | **Forgery Or Alteration** | $ 100,000 | $ 2,500 |
| 3. | **Inside The Premises – Theft Of Money And Securities** | $ 50,000 | $ 2,500 |
| 4. | **Inside The Premises – Robbery Or Safe Burglary Of Other Property** | $ 50,000 | $ 2,500 |
| 5. | **Outside The Premises** | $ 50,000 | $ 2,500 |
| 6. | **Computer And Funds Transfer Fraud** | $ 100,000 | $ 2,500 |
| 7. | **Money Orders And Counterfeit Money** | $ 50,000 | $ 2,500 |

If "Not Covered" is inserted above opposite any specified Insuring Agreement, such Insuring Agreement and any other reference thereto in this Policy are deleted.

---

**If Added By Endorsement:**

| Insuring Agreement(s) | Limit Of Insurance Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |

**Endorsements Forming Part Of This Coverage Part When Issued:**

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 13 of 40

| Cancellation Of Prior Insurance Issued By Us: |
|---|
| By acceptance of this Coverage Part, you give us notice cancelling prior Policy Numbers<br>                        ; the cancellation to be effective at the time this Coverage Part becomes effective. |

| Countersignature Of Authorized Representative |
|---|
| Name: |
| Title: |
| Signature: |
| Date: |

# New York Marine and General Insurance Company

59 Maiden Lane 27th Floor
New York, NY 10038-4647

## COMMON POLICY DECLARATIONS

POLICY NUMBER: CR2019DOP00439          PREVIOUS POLICY NUMBER:  New

| COMPANY NAME | PRODUCER NAME | 00608 |
|---|---|---|
| New York Marine and General Insurance Company 59 Maiden Lane 27th Floor New York, NY 10038-4647 | Risk Theory Insurance Services, LLC 13455 Noel Road Suite 2300 Dallas, TX 75240-1534 | |

NAMED INSURED: Don Elliott Chevrolet, Inc DBA Don Elliott Autoworld

MAILING ADDRESS: P.O. Box 1210 Wharton, TX 77488

POLICY PERIOD:  FROM 8/1/2019          TO  8/1/2020

          AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN  ABOVE.

| BUSINESS DESCRIPTION | |
|---|---|

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS  POLICY.

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. |
|---|
| |

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 15 of 40

POLICY NUMBER: CR2019DOP00439

| FORMS APPLICABLE TO ALL COVERAGE PARTS (SHOW NUMBERS): |  |
|---|---|
| See Schedule of Forms and Endorsements. | |
| Countersigned | By: |
| (Date) | (Authorized Representative) |

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 16 of 40

# NAMED INSURED EXTENSION SCHEDULE

Policy Number: CR2019DOP00439                    Effective Date: 8/1/2019

Don Elliott Chevrolet, Inc dba Don Elliott Autoworld          PO Box 1210
Harvest Properties, Inc dba Don Elliott Ford                 Wharton, TX 77488
Sunshine Chevrolet, LLC

INSDSCHD 04 06

# SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER: | CR2019DOP00439 | EFFECTIVE DATE: | 08/01/2019 |
|---|---|---|---|

| NUMBER | EDITION DATE | TITLE |
|---|---|---|
| | | **Crime** |
| PN 04 99 37 | 02 16 | HOW TO REPORT A CLAIM NOTICE |
| IL 0001 | 10 10 | SIGNATURE PAGE |
| CR DS 01 | 08 13 | CRIME AND FIDELITY COVERAGE PART DECLARATIONS (COMMERCIAL ENTITIES) |
| IL DS 00 | 09 08 | COMMON POLICY DECLARATIONS |
| INSDSCHD | 04 06 | NAMED INSURED EXTENSION SCHEDULE |
| END SCHD | 04 06 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| IL 00 17 | 11 98 | COMMON POLICY CONDITIONS |
| CR 00 21 | 11 15 | COMMERCIAL CRIME COVERAGE FORM (LOSS SUSTAINED FORM) |
| IL 09 35 | 07 02 | EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES |
| CR 02 47 | 10 10 | TEXAS CHANGES |
| IL 02 88 | 09 07 | TEXAS CHANGES - CANCELLATION AND NONRENEWAL |
| IL 01 71 | 09 07 | TEXAS CHANGES - LOSS PAYMENT |

**END SCHD**                                   Original                                   Page 1 of 1

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 18 of 40

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and

   **c.** Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   **a.** Are safe or healthful; or

   **b.** Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc., 1998

# COMMERCIAL CRIME COVERAGE FORM
# (LOSS SUSTAINED FORM)

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is or is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit Of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the Declarations, except as provided in Condition **E.1.k.** or **E.1.l.**, which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition **E.1.g.**:

### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

### 2. Forgery Or Alteration

**a.** We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

  **(1)** Made or drawn by or drawn upon you; or

  **(2)** Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

**b.** If you are sued for refusing to pay any instrument covered in Paragraph **2.a.**, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay for such legal expenses is in addition to the Limit of Insurance applicable to this Insuring Agreement.

### 3. Inside The Premises – Theft Of Money And Securities

We will pay for:

**a.** Loss of "money" and "securities" inside the "premises" or "financial institution premises":

  **(1)** Resulting directly from "theft" committed by a person present inside such "premises" or "financial institution premises"; or

  **(2)** Resulting directly from disappearance or destruction.

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

**c.** Loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of, or unlawful entry into, those containers.

### 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property

We will pay for:

**a.** Loss of or damage to "other property":

  **(1)** Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

  **(2)** Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

© Insurance Services Office, Inc., 2015

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 20 of 40

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

**c.** Loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

**5. Outside The Premises**

We will pay for:

**a.** Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

**b.** Loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**6. Computer And Funds Transfer Fraud**

**a.** We will pay for:

**(1)** Loss resulting directly from a fraudulent:

**(a)** Entry of "electronic data" or "computer program" into; or

**(b)** Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **6.a.(1)(a)** and **6.a.(1)(b):**

**(i)** "Money", "securities" or "other property" to be transferred, paid or delivered; or

**(ii)** Your account at a "financial institution" to be debited or deleted.

**(2)** Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that account.

**b.** As used in Paragraph **6.a.(1),** fraudulent entry or fraudulent change of "electronic data" or "computer program" shall include such entry or change made by an "employee" acting, in good faith, upon a "fraudulent instruction" received from a computer software contractor who has a written agreement with you to design, implement or service "computer programs" for a "computer system" covered under this Insuring Agreement.

**7. Money Orders And Counterfeit Money**

We will pay for loss resulting directly from your having, in good faith, accepted in exchange for merchandise, "money" or services:

**a.** Money orders issued by any post office, express company or "financial institution" that are not paid upon presentation; or

**b.** "Counterfeit money" that is acquired during the regular course of business.

**B. Limit Of Insurance**

The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit Of Insurance shown in the Declarations.

If any loss is covered under more than one Insuring Agreement or coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or coverages.

**C. Deductible**

We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

**D. Exclusions**

**1.** This insurance does not cover:

**a. Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

**(1)** You; or

**(2)** Any of your partners or "members";

whether acting alone or in collusion with other persons.

© Insurance Services Office, Inc., 2015

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 21 of 40

### b. Acts Committed By Your Employees Learned Of By You Prior To The Policy Period

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of such "theft" or dishonest act prior to the Policy Period shown in the Declarations.

### c. Acts Committed By Your Employees, Managers, Directors, Trustees Or Representatives

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

(1) Whether acting alone or in collusion with other persons; or

(2) While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

### d. Confidential Or Personal Information

Loss resulting from:

(1) The disclosure or use of another person's or organization's confidential or personal information; or

(2) The disclosure of your confidential or personal information. However, this Paragraph **1.d.(2)** does not apply to loss otherwise covered under this insurance that results directly from the use of your confidential or personal information.

For the purposes of this exclusion, confidential or personal information includes, but is not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

### e. Data Security Breach

Fees, costs, fines, penalties and other expenses incurred by you which are related to the access to or disclosure of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

### f. Governmental Action

Loss resulting from seizure or destruction of property by order of governmental authority.

### g. Indirect Loss

Loss that is an indirect result of an "occurrence" covered by this insurance including, but not limited to, loss resulting from:

(1) Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property";

(2) Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance; or

(3) Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

### h. Legal Fees, Costs And Expenses

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

### i. Nuclear Hazard

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

### j. Pollution

Loss or damage caused by or resulting from pollution. Pollution means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

### k. Virtual Currency

Loss involving virtual currency of any kind, by whatever name known, whether actual or fictitious including, but not limited to, digital currency, crypto currency or any other type of electronic currency.

### l. War And Military Action

Loss or damage resulting from:

(1) War, including undeclared or civil war;

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 22 of 40

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

2. Insuring Agreement **A.1.** does not cover:

a. **Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

b. **Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

c. **Warehouse Receipts**

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

3. Insuring Agreements **A.3.**, **A.4.** and **A.5.** do not cover:

a. **Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

b. **Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

c. **Fire**

Loss or damage resulting from fire, however caused, except:

(1) Loss of or damage to "money" and "securities"; and

(2) Loss from damage to a safe or vault.

d. **Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

e. **Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semitrailers or equipment and accessories attached to them.

f. **Transfer Or Surrender Of Property**

(1) Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "financial institution premises":

(a) On the basis of unauthorized instructions; or

(b) As a result of a threat including, but not limited to:

(i) A threat to do bodily harm to any person;

(ii) A threat to do damage to any property;

(iii) A threat to introduce a denial of service attack into any "computer system";

(iv) A threat to introduce a virus or other malicious instruction into any "computer system" which is designed to damage, destroy or corrupt "electronic data" or "computer programs" stored within the "computer system";

(v) A threat to contaminate, pollute or render substandard your products or goods; or

(vi) A threat to disseminate, divulge or utilize:

i. Your confidential information;

ii. Confidential or personal information of another person or organization; or

iii. Weaknesses in the source code within any "computer system".

 © Insurance Services Office, Inc., 2015

**(2)** However, this exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

    **(a)** Had no knowledge of any threat at the time the conveyance began; or

    **(b)** Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g. Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

**h. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone else acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

**4.** Insuring Agreement **A.6.** does not cover:

**a. Authorized Access**

Loss resulting from a fraudulent:

**(1)** Entry of "electronic data" or "computer program" into; or

**(2)** Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you by a person or organization with authorized access to that "computer system", except when covered under Insuring Agreement **A.6.b.**

**b. Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

**c. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**d. Fraudulent Instructions**

Loss resulting from an "employee" or "financial institution" acting upon any instruction to:

**(1)** Transfer, pay or deliver "money", "securities" or "other property"; or

**(2)** Debit or delete your account;

which instruction proves to be fraudulent, except when covered under Insuring Agreement **A.6.a.(2)** or **A.6.b.**

**e. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

**E. Conditions**

The following conditions apply in addition to the Common Policy Conditions:

**1. Conditions Applicable To All Insuring Agreements**

**a. Additional Premises Or Employees**

If, while this insurance is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this insurance. Notice to us of an increase in the number of "premises" or "employees" is not required, and no additional premium will be charged for the remainder of the Policy Period shown in the Declarations.

**b. Concealment, Misrepresentation Or Fraud**

This insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other Insured, at any time, intentionally conceals or misrepresents a material fact concerning:

**(1)** This insurance;

**(2)** The property covered under this insurance;

**(3)** Your interest in the property covered under this insurance; or

**(4)** A claim under this insurance.

**c. Consolidation – Merger Or Acquisition**

If you consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

(1) You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this insurance to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this insurance shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**d. Cooperation**

You must cooperate with us in all matters pertaining to this insurance as stated in its terms and conditions.

**e. Duties In The Event Of Loss**

After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property", you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities;

(2) Give us a detailed, sworn proof of loss within 120 days;

(3) Cooperate with us in the investigation and settlement of any claim;

(4) Produce for our examination all pertinent records;

(5) Submit to examination under oath at our request and give us a signed statement of your answers; and

(6) Secure all of your rights of recovery against any person or organization responsible for the loss and do nothing to impair those rights.

**f. Employee Benefit Plans**

The "employee benefit plans" shown in the Declarations (hereinafter referred to as Plan) are included as Insureds under Insuring Agreement **A.1.**, subject to the following:

(1) If any Plan is insured jointly with any other entity under this insurance, you or the Plan Administrator is responsible for selecting a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required under ERISA as if each Plan were separately insured.

(2) With respect to loss sustained or "discovered" by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(3) If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

(4) If two or more Plans are insured under this insurance, any payment we make for loss:

(a) Sustained by two or more Plans; or

(b) Of commingled "money", "securities" or "other property" of two or more Plans;

resulting directly from an "occurrence", will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required under ERISA for each Plan bears to the total of those limits.

(5) The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

© Insurance Services Office, Inc., 2015

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 25 of 40

**g. Extended Period To Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this insurance, which is "discovered" by you:

**(1)** No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(2)** No later than one year from the date of that cancellation with regard to any "employee benefit plan".

**h. Joint Insured**

**(1)** If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**(2)** If any Insured, or partner, "member", "manager", officer, director or trustee of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

**(3)** An "employee" of any Insured is considered to be an "employee" of every Insured.

**(4)** If this insurance or any of its coverages are cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

**(a)** No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(b)** No later than one year from the date of that cancellation with regard to any "employee benefit plan".

**(5)** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

**(6)** Payment by us to the first Named Insured for loss sustained by any Insured, or payment by us to any "employee benefit plan" for loss sustained by that Plan, shall fully release us on account of such loss.

**i. Legal Action Against Us**

You may not bring any legal action against us involving loss:

**(1)** Unless you have complied with all the terms of this insurance;

**(2)** Until 90 days after you have filed proof of loss with us; and

**(3)** Unless brought within two years from the date you "discovered" the loss.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**j. Liberalization**

If we adopt any revision that would broaden the coverage under this insurance without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this insurance.

**k. Loss Sustained During Prior Insurance Issued By Us Or Any Affiliate**

**(1) Loss Sustained Partly During This Insurance And Partly During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place:

**(a)** Partly during the Policy Period shown in the Declarations; and

**(b)** Partly during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest;

and this insurance became effective at the time of cancellation of the prior insurance, we will first settle the amount of loss that you sustained during this Policy Period. We will then settle the remaining amount of loss that you sustained during the policy period(s) of the prior insurance.

Case 1:21-cv-00108-MR-DSC    Document 1-1    Filed 04/20/21    Page 26 of 40

**(2) Loss Sustained Entirely During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place entirely during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest, we will pay for the loss, provided:

**(a)** This insurance became effective at the time of cancellation of the prior insurance; and

**(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

We will first settle the amount of loss that you sustained during the most recent prior insurance. We will then settle any remaining amount of loss that you sustained during the policy period(s) of any other prior insurance.

**(3)** In settling loss under Paragraphs **k.(1)** and **k.(2):**

**(a)** The most we will pay for the entire loss is the highest single Limit of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior insurance issued by us.

**(b)** We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this insurance. If no loss was sustained under this insurance, we will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this insurance, or the most recent prior insurance, we will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

We will not apply any other Deductible Amount that may have been applicable to the loss.

**(4)** The following examples demonstrate how we will settle losses subject to this condition:

**Example Number 1**

The Insured sustained a covered loss of $10,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B.**

**Policy A**

The current policy. Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

**Policy B**

Issued prior to Policy **A.** Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

**Settlement Of Loss**

The amount of loss sustained under Policy **A** is $2,500 and under Policy **B,** $7,500.

The highest single Limit of Insurance applicable to this entire loss is $50,000 written under Policy **A.** The Policy **A** Deductible Amount of $5,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($2,500) is settled first. The amount we will pay is nil ($0.00) because the amount of loss is less than the Deductible Amount (i.e., $2,500 loss - $5,000 deductible = $0.00).

**(b)** The remaining amount of loss sustained under Policy **B** ($7,500) is settled next. The amount recoverable is $5,000 after the remaining Deductible Amount from Policy **A** of $2,500 is applied to the loss (i.e., $7,500 loss - $2,500 deductible = $5,000).

The most we will pay for this loss is $5,000.

**Example Number 2**

The Insured sustained a covered loss of $250,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B.**

**Policy A**

The current policy. Written at a Limit of Insurance of $125,000 and a Deductible Amount of $10,000.

© Insurance Services Office, Inc., 2015

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 27 of 40

### Policy B

Issued prior to Policy **A.** Written at a Limit of Insurance of $150,000 and a Deductible Amount of $25,000.

#### Settlement Of Loss

The amount of loss sustained under Policy **A** is $175,000 and under Policy **B,** $75,000.

The highest single Limit of Insurance applicable to this entire loss is $150,000 written under Policy **B.** The Policy **A** Deductible Amount of $10,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($175,000) is settled first. The amount we will pay is the Policy **A** Limit of $125,000 because $175,000 loss - $10,000 deductible = $165,000, which is greater than the $125,000 policy limit.

**(b)** The remaining amount of loss sustained under Policy **B** ($75,000) is settled next. The amount we will pay is $25,000 (i.e., $150,000 Policy **B** limit - $125,000 paid under Policy **A** = $25,000).

The most we will pay for this loss is $150,000.

#### Example Number 3

The Insured sustained a covered loss of $2,000,000 resulting directly from an "occurrence" taking place during the terms of Policies **A, B, C** and **D.**

### Policy A

The current policy. Written at a Limit of Insurance of $1,000,000 and a Deductible Amount of $100,000.

### Policy B

Issued prior to Policy **A.** Written at a Limit of Insurance of $750,000 and a Deductible Amount of $75,000.

### Policy C

Issued prior to Policy **B.** Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

### Policy D

Issued prior to Policy **C.** Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

#### Settlement Of Loss

The amount of loss sustained under Policy **A** is $350,000; under Policy **B,** $250,000; under Policy **C,** $600,000; and under Policy **D,** $800,000.

The highest single Limit of Insurance applicable to this entire loss is $1,000,000 written under Policy **A.** The Policy **A** Deductible Amount of $100,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($350,000) is settled first. The amount we will pay is $250,000 (i.e., $350,000 loss - $100,000 deductible = $250,000).

**(b)** The amount of loss sustained under Policy **B** ($250,000) is settled next. The amount we will pay is $250,000 (no deductible is applied).

**(c)** The amount of loss sustained under Policy **C** ($600,000) is settled next. The amount we will pay is $500,000, the policy limit (no deductible is applied).

**(d)** We will not make any further payment under Policy **D,** as the maximum amount payable under the highest single Limit of Insurance applying to the loss of $1,000,000 under Policy **A** has been satisfied.

The most we will pay for this loss is $1,000,000.

### I. Loss Sustained During Prior Insurance Not Issued By Us Or Any Affiliate

**(1)** If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place during the policy period of any prior cancelled insurance that was issued to you or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, we will pay for the loss under this insurance, provided:

**(a)** This insurance became effective at the time of cancellation of the prior insurance; and

**(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 28 of 40

(2) In settling loss subject to this condition:

  (a) The most we will pay for the entire loss is the lesser of the Limits of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior cancelled insurance.

  (b) We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

(3) The insurance provided under this condition is subject to the following:

  (a) If loss covered under this condition is also partially covered under Condition **E.1.k.**, the amount recoverable under this condition is part of, not in addition to, the amount recoverable under Condition **E.1.k.**

  (b) For loss covered under this condition that is not subject to Paragraph **l.(3)(a)**, the amount recoverable under this condition is part of, not in addition to, the Limit of Insurance applicable to the loss covered under this insurance and is limited to the lesser of the amount recoverable under:

    (i) This insurance as of its effective date; or

    (ii) The prior cancelled insurance had it remained in effect.

**m. Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this insurance, our obligations are limited as follows:

**(1) Primary Insurance**

When this insurance is written as primary insurance, and:

  (a) You have other insurance subject to the same terms and conditions as this insurance, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit Of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

  (b) You have other insurance covering the same loss other than that described in Paragraph **m.(1)(a)**, we will only pay for the amount of loss that exceeds:

    (i) The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

    (ii) The Deductible Amount shown in the Declarations;

    whichever is greater. Our payment for loss is subject to the terms and conditions of this insurance.

**(2) Excess Insurance**

  (a) When this insurance is written excess over other insurance, we will only pay for the amount of loss that exceeds the Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this insurance.

  (b) However, if loss covered under this insurance is subject to a deductible, we will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

**n. Ownership Of Property; Interests Covered**

The property covered under this insurance is limited to property:

**(1)** That you own or lease;

**(2)** That is held by you in any capacity; or

**(3)** For which you are legally liable, provided you were liable for the property prior to the time the loss was sustained.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this insurance must be presented by you.

**o. Records**

You must keep records of all property covered under this insurance so we can verify the amount of any loss.

© Insurance Services Office, Inc., 2015
Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 29 of 40

**p. Recoveries**

  **(1)** Any recoveries, whether effected before or after any payment under this insurance, whether made by us or by you, shall be applied net of the expense of such recovery:

    **(a)** First, to you in satisfaction of your covered loss in excess of the amount paid under this insurance;

    **(b)** Second, to us in satisfaction of amounts paid in settlement of your claim;

    **(c)** Third, to you in satisfaction of any Deductible Amount; and

    **(d)** Fourth, to you in satisfaction of any loss not covered under this insurance.

  **(2)** Recoveries do not include any recovery:

    **(a)** From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

    **(b)** Of original "securities" after duplicates of them have been issued.

**q. Territory**

This insurance covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**r. Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**s. Valuation – Settlement**

The value of any loss for purposes of coverage under this insurance shall be determined as follows:

  **(1) Money**

Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

    **(a)** At face value in the "money" issued by that country; or

    **(b)** In the United States of America dollar equivalent, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

  **(2) Securities**

Loss of "securities" but only up to and including their value at the close of business on the day the loss was "discovered". We may, at our option:

    **(a)** Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

    **(b)** Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

      **(i)** Market value of the "securities" at the close of business on the day the loss was "discovered"; or

      **(ii)** Limit of Insurance applicable to the "securities".

  **(3) Property Other Than Money And Securities**

    **(a)** Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

      **(i)** The Limit of Insurance applicable to the lost or damaged property;

      **(ii)** The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

      **(iii)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

Case 1:21-cv-00108-MR-DSC    Document 1-1    Filed 04/20/21    Page 30 of 40

**(b)** We will not pay on a replacement cost basis for any loss or damage to property covered under Paragraph **s.(3)(a)**:

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

**(c)** We will, at your option, pay for loss or damage to such property:

**(i)** In the "money" of the country in which the loss or damage was sustained; or

**(ii)** In the United States of America dollar equivalent of the "money" of the country in which the loss or damage was sustained, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

**(d)** Any property that we pay for or replace becomes our property.

**2. Conditions Applicable To Insuring Agreement A.1.**

**a. Termination As To Any Employee**

This Insuring Agreement terminates as to any "employee":

**(1)** As soon as:

**(a)** You; or

**(b)** Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you; or

**(2)** On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**b. Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in Territory Condition **E.1.q.** for a period of not more than 90 consecutive days.

**3. Conditions Applicable To Insuring Agreement A.2.**

**a. Deductible Amount**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

**b. Electronic And Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

**c. Proof Of Loss**

You must include with your proof of loss any instrument involved in that loss or, if that is not possible, an affidavit setting forth the amount and cause of loss.

**d. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.2.**

**4. Conditions Applicable To Insuring Agreements A.4. And A.5.**

**a. Armored Motor Vehicle Companies**

Under Insuring Agreement **A.5.**, we will only pay for the amount of loss you cannot recover:

**(1)** Under your contract with the armored motor vehicle company; and

**(2)** From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

**b. Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

**(1)** Precious metals, precious or semiprecious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

**(2)** Manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**5. Conditions Applicable To Insuring Agreement A.6.**

**a. Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**b. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.6.**

**F. Definitions**

1. "Computer program" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enable the computer or devices to receive, process, store or send "electronic data".

2. "Computer system" means:

    **a.** Computers, including Personal Digital Assistants (PDAs) and other transportable or handheld devices, electronic storage devices and related peripheral components;

    **b.** Systems and applications software; and

    **c.** Related communications networks;

    by which "electronic data" is collected, transmitted, processed, stored or retrieved.

3. "Counterfeit money" means an imitation of "money" which is intended to deceive and to be taken as genuine.

4. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5. "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insurance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

"Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this insurance.

6. "Electronic data" means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on data storage devices, including hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

7. "Employee":

    **a. Means:**

    **(1)** Any natural person:

    **(a)** While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any dishonest act committed by the "employee";

    **(b)** Whom you compensate directly by salary, wages or commissions; and

    **(c)** Whom you have the right to direct and control while performing services for you;

    **(2)** Any natural person who is furnished temporarily to you:

    **(a)** To substitute for a permanent "employee", as defined in Paragraph **7.a.(1)**, who is on leave; or

    **(b)** To meet seasonal or short-term work load conditions;

    while that person is subject to your direction and control and performing services for you;

    **(3)** Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary "employee" as defined in Paragraph **7.a.(2)**;

    **(4)** Any natural person who is:

    **(a)** A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; or

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 32 of 40

**(b)** Your director or trustee while that person is engaged in handling "money", "securities" or "other property" of any "employee benefit plan";

**(5)** Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained by you as a consultant while performing services for you;

**(6)** Any natural person who is a guest student or intern pursuing studies or duties;

**(7)** Any natural person employed by an entity merged or consolidated with you prior to the effective date of this insurance; and

**(8)** Any natural person who is your "manager", director or trustee while:

**(a)** Performing acts within the scope of the usual duties of an "employee"; or

**(b)** Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

**b.** Does not mean:

Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph **7.a.**

**8.** "Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and that is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

**9.** "Financial institution" means:

**a.** With regard to Insuring Agreement **A.3.**:

**(1)** A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution; or

**(2)** An insurance company.

**b.** With regard to Insuring Agreement **A.6.**:

**(1)** A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution;

**(2)** An insurance company; or

**(3)** A stock brokerage firm or investment company.

**c.** Other than Insuring Agreements **A.3.** and **A.6.**, any financial institution.

**10.** "Financial institution premises" means the interior of that portion of any building occupied by a "financial institution" as defined in Paragraph **F.9.a.**

**11.** "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

**12.** "Fraudulent instruction" means:

**a.** With regard to Insuring Agreement **A.6.a.(2)**:

**(1)** A computer, telefacsimile, telephone or other electronic instruction directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", which instruction purports to have been issued by you, but which in fact was fraudulently issued by someone else without your knowledge or consent; or

**(2)** A written instruction (other than those covered under Insuring Agreement **A.2.**) issued to a "financial institution" directing the "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by you, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

**b.** With regard to Insuring Agreement **A.6.b.**:

A computer, telefacsimile, telephone or other electronic, written or voice instruction directing an "employee" to enter or change "electronic data" or "computer programs" within a "computer system" covered under the Insuring Agreement, which instruction in fact was fraudulently issued by your computer software contractor.

**13.** "Manager" means a natural person serving in a directorial capacity for a limited liability company.

**14.** "Member" means an owner of a limited liability company represented by its membership interest who, if a natural person, may also serve as a "manager".

 © Insurance Services Office, Inc., 2015 **CR 00 21 11 15**

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 33 of 40

15. "Messenger" means you, or your relative, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

16. "Money" means:

   a. Currency, coins and bank notes in current use and having a face value;

   b. Traveler's checks and money orders held for sale to the public; and

   c. In addition, includes:

      (1) Under Insuring Agreements **A.1.** and **A.2.,** deposits in your account at any "financial institution"; and

      (2) Under Insuring Agreement **A.6.,** deposits in your account at a "financial institution" as defined in Paragraph **F.9.b.**

17. "Occurrence" means:

   a. Under Insuring Agreement **A.1.:**

      (1) An individual act;

      (2) The combined total of all separate acts whether or not related; or

      (3) A series of acts whether or not related;

      committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

   b. Under Insuring Agreement **A.2.:**

      (1) An individual act;

      (2) The combined total of all separate acts whether or not related; or

      (3) A series of acts whether or not related;

      committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

   c. Under all other Insuring Agreements:

      (1) An individual act or event;

      (2) The combined total of all separate acts or events whether or not related; or

      (3) A series of acts or events whether or not related;

      committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

18. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include "computer programs", "electronic data" or any property specifically excluded under this insurance.

19. "Premises" means the interior of that portion of any building you occupy in conducting your business.

20. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

   a. Caused or threatened to cause that person bodily harm; or

   b. Committed an obviously unlawful act witnessed by that person.

21. "Safe burglary" means the unlawful taking of:

   a. Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

   b. A safe or vault from inside the "premises".

22. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

   but does not include "money".

23. "Theft" means the unlawful taking of property to the deprivation of the Insured.

24. "Transfer account" means an account maintained by you at a "financial institution" from which you can initiate the transfer, payment or delivery of "money" or "securities":

   a. By means of computer, telefacsimile, telephone or other electronic instructions; or

   b. By means of written instructions (other than those covered under Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such "financial institution" through an electronic funds transfer system.

25. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

   **1.** The failure, malfunction or inadequacy of:

   **a.** Any of the following, whether belonging to any insured or to others:

   **(1)** Computer hardware, including micro-processors;

   **(2)** Computer application software;

   **(3)** Computer operating systems and related software;

   **(4)** Computer networks;

   **(5)** Microprocessors (computer chips) not part of any computer system; or

   **(6)** Any other computerized or electronic equipment or components; or

   **b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

   due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

   **2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

   **1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

   **2.** Under the Commercial Property Coverage Part:

   **a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss – Special Form; or

   **b.** In a Covered Cause of Loss under the Causes Of Loss – Basic Form or the Causes Of Loss – Broad Form;

   we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.

 © ISO Properties, Inc., 2001

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME POLICY
GOVERNMENT EMPLOYEE THEFT AND FORGERY POLICY
KIDNAP/RANSOM AND EXTORTION POLICY

**A.** The following is added to the **Cancellation Of Policy** Condition:

Under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**B.** The following is added and supersedes any other provision to the contrary:

**Nonrenewal**

**1.** We may elect not to renew this policy except that, under the provisions of the Texas Insurance Code, we may not refuse to renew this policy solely because the policyholder is an elected official.

**2.** If we elect not to renew this policy, we will mail or deliver to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal, stating the reason for nonrenewal, at least 30 days before the expiration date.

**C.** The following is added to Section **E. Conditions:**

**Claims Handling**

**1.** Within 15 days after we receive written notice of claim, we will:

   **a.** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

   **b.** Begin any investigation of the claim; and

   **c.** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

**2.** We will notify you in writing as to whether:

   **a.** The claim or part of the claim will be paid;

   **b.** The claim or part of the claim has been denied, and inform you of the reasons for denial;

   **c.** More information is necessary; or

   **d.** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in **2.a.** through **2.d.,** within 15 business days after we receive the signed, sworn proof of loss and all information we requested.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

**3.** We will pay for covered loss or damage within five business days after:

   **a.** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

   **b.** An award has been made.

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this policy, we will make payment within five business days after the date you have complied with such terms.

**4.** The term "business day", as used in this endorsement, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**D.** The **Legal Action Against Us** Condition is replaced by the following:

**Legal Action Against Us**

1. You may not bring any legal action against us involving loss unless:

    **a.** There has been full compliance with all of the terms of this policy; and

    **b.** The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

**E.** Under the Government Crime Policy and the Government Employee Theft and Forgery Policy, Paragraph **(2)** of the **Cancellation Of Policy** Condition is replaced by the following:

    **(2)** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at least 10 days before the effective date of cancellation.

**(a)** If this policy has been in effect for 90 days or less, we may cancel for any reason except, that under provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**(b)** If this policy has been in effect for more than 90 days, we may cancel this policy if:

   **(i)** The Named Insured does not pay any portion of the premium when due;

   **(ii)** The Insured submits a fraudulent claim;

   **(iii)** The Texas Department of Insurance determines that continuation of the policy would result in a violation of the Insurance Code or other law governing the business of insurance in the state; or

   **(iv)** There is an increase in the hazard covered by the policy that is within the control of the Insured and that would produce an increase in the premium rate of the policy.

© Insurance Services Office, Inc., 2010
CR 02 47 10 10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART – LIVESTOCK COVERAGE FORM
FARM COVERAGE PART – MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM

**A.** The following is added to Paragraph **2.** of the **Cancellation** Common Policy Condition:

We may cancel this policy for any reason except, that under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**B.** The following condition is added:

**NONRENEWAL**

We may elect not to renew this policy except, that under the provisions of the Texas Insurance Code, we may not refuse to renew this policy solely because the policyholder is an elected official.

 © ISO Properties, Inc., 2006

Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 38 of 40

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES – LOSS PAYMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART

**A. Loss Payment**

1. With respect to the Crime And Fidelity Coverage Part and Equipment Breakdown Coverage Part, the following conditions are added.

2. With respect to the Commercial Inland Marine Coverage Part, the following conditions replace Item **E. Loss Payment** in the Commercial Inland Marine Loss Conditions:

   **a. Claims Handling**

   **(1)** Within 15 days after we receive written notice of claim, we will:

      **(a)** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

      **(b)** Begin any investigation of the claim; and

      **(c)** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

   **(2)** We will notify you in writing as to whether:

      **(a)** The claim or part of the claim will be paid;

      **(b)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

      **(c)** More information is necessary; or

      **(d)** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

   We will provide notification, as described in **(2)(a)** through **(2)(d)** above, within:

      **(i)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

      **(ii)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

   If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

© ISO Properties, Inc., 2006
Case 1:21-cv-00108-MR-DSC   Document 1-1   Filed 04/20/21   Page 39 of 40

**b.** We will pay for covered loss or damage within 5 business days after:

   **(1)** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

   **(2)** An appraisal award has been made.

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this policy, we will make payment within 5 business days after the date you have complied with such terms.

**c. Catastrophe Claims**

If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in **a.** and **b.** above are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which is:

   **(1)** Declared a disaster under the Texas Disaster Act of 1975; or

   **(2)** Determined to be a catastrophe by the State Board of Insurance.

**d.** The term "business day", as used in this endorsement, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**B.** With respect to the Commercial Inland Marine Coverage Part the following is added:

We will not be liable for any part of a "loss" that has been paid or made good by others.

 © ISO Properties, Inc., 2006 **IL 01 71 09 07**